**Brian Butler, OSB No.**
**Assistant Federal Public Defender**
**15 Newtown Street**
**Medford, Oregon 97501**
**Tel: (541) 776-3630**
**Fax:(541) 776-3624**
**Email: Brian_Butler@fd.org**


**Attorney for Defendant**



### IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF OREGON



| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **Case No. 1:18-cr-00214-MC** |
| **Plaintiff,** | |
| | **MOTION TO SUPPRESS** |
| | **EVIDENCE AND STATEMENTS** |
| | **AND MEMORANDUM OF LAW** |
| **v.** | **IN SUPPORT OF MOTION** |
| **JULIO CESAR ARUIZA-ANDRADE,** | **EVIDENTIARY HEARING** |
| | **REQUESTED** |
| **Defendant.** | |

## Table of Contents

**Page**

Introduction ................................................................................................................ 1

Factual Background ................................................................................................... 2

Argument ................................................................................................................... 8

A.      Officer Broome Violated Mr. Aruiza-Andrade's Fourth Amendment Right Not
        To Be Subject To An Unreasonable Search And Seizure By Unconstitutionally
        Extending The Traffic Stop To Perform A Drug Investigation Without Reasonable
        Suspicion. ............................................................................................................ 8

B.      Mr. Aruiza-Andrade Did Not Knowingly And Intelligently Waive His *Miranda*
        Rights Prior To Being Questioned By The Police Officers And His Statements Must
        Be Suppressed. ................................................................................................. 16

Conclusion .............................................................................................................. 19

## Table of Authorities

### Federal Cases

Page(s)

*Berkemer v. McCarty*,
468 U.S. 420 (1984) ................................................................................................. 9

*Coolidge v. New Hampshire*,
403 U.S. 443 (1971) ............................................................................................... 8-9

*Florida v. Royer*,
460 U.S. 491 (1983) ................................................................................................. 9

*Georgia v. Randolph*,
547 U.S. 103 (2006) ................................................................................................. 8

*Illinois v. Caballes*,
543 U.S. 405 (2005) ................................................................................................. 9

*Johnson v. Zerbst*,
304 U.S. 458 (1938) ............................................................................................. 17-18

*Jones v. United States*,
357 U.S. 493 (1958) ................................................................................................. 8

*Katz v. United States*,
389 U.S. 347 (1967) ................................................................................................. 8

*Miranda v. Arizona*,
384 U.S. 436 (1966) ............................................................................................... 16

*Missouri v. Seibert*,
542 U.S. 600 (2004) ............................................................................................... 16

*Moran v. Burbine*,
475 U.S. 412 (1986) ............................................................................................. 16-17

*North Carolina v. Butler*,
441 U.S. 369 (1979) ............................................................................................... 17

*Rodriguez v. United States*,
135 S. Ct. 1609 (2015) ...................................................................................... 1, 9, 10, 11

*United States v. Abarza*,
143 F.Supp.3d 1082, 1094-95 (2015), *clarified on reconsideration, United States v. Abarza*,
199 F.Supp.3d 1270 (2016) ............................................................................... 15, 19

*United States v. Bailey*,
743 F.3d 322 (2d Cir. 2014) ................................................................ 16

*United States v. Chavez-Valenzuela*,
268 F.3d 719 (9th Cir. 2001) ............................................................... 10

*United States v. Digiovanni*,
650 F.3d 498 (4th Cir. 2011) .......................................................... 10, 11

*United States v. Gorman*,
859 F.3d 706 (9th Cir. 2017) ............................................................ 1, 11

*United States v. Higareda-Santa Cruz*,
826 F.Supp. 355 (D. Or. 1993) ....................................................... 15, 18

*United States v. Izguerra-Robles*,
660 F.Supp.2d 1202 (D. Or. 2009) ................................................. 13, 18

*United States v. Jeffers*,
342 U.S. 48 (1951) ........................................................................... 8-9

*United States v. Kaguras*,
183 Fed. Appx. 783 (10th Cir. 2006) ................................................ 9-10

*United States v. Lopez-Arias*,
344 F.3d 623 (6th Cir. 2003) ............................................................... 16

*United States v. Mota*,
982 F.2d 1384 (9th Cir. 1993) ............................................................. 17

*United States v. Rodriguez*,
869 F.2d 479 (9th Cir. 1989) ............................................................... 16

*United States v. Shepherd*,
21 F.3d 933 (9th Cir. 1994) ................................................................. 17

*United States v. Strickler*,
490 F.2d 378 (9th Cir. 1974) ............................................................... 16

*United States v. Washington*,
387 F.3d 1060 (9th Cir. 2004) ............................................................. 19

*United States v. Washington*,
739 F. Supp. 546 (D. Or. 1990) ..................................................... 14, 19

*United States v. Wendfeldt*,
58 F.Supp.3d 1124 (D. Nev. 2014) ............................................................... 11

*Wolf v. Colorado*,
338 U.S. 25 (1949) ........................................................................................ 8

*Wong Sun v. United States*,
371 U.S. 471 (1963) ...................................................................................... 17

## Federal Statutes

18 U.S.C. § 922(g)......................................................................................... 1

## State Cases

*Longshore v. State*,
399 Md. 486 (Md. Ct. App. 2007) .............................................................. 16

*State v. Porter*,
312 Or. 112 (1991) ...................................................................................... 17

*State v. Rodgers*,
347 Or. 610 (2010) ...................................................................................... 19

## State Statutes

ORS 807.570 ................................................................................... 12, 13, 14, 19

ORS 807.570(4) ............................................................................................ 14

ORS 810.410(3) ............................................................................................ 17

## Federal Rules of Criminal Procedure and Constitutional Amendment

Fed. R. Crim. P. 12 ....................................................................................... 1

Fourth Amendment to the U.S. Constitution ...................................... 1, 8, 12, 14, 16

## Introduction

Julio Cesar Aruiza-Andrade, through his attorney, Assistant Federal Public Defender Brian Butler, hereby seeks an order directing suppression of all evidence derived from the unconstitutional search and seizure of his person and vehicle. The video recording of the seizure establishes that the officer prolonged the traffic stop to perform a drug investigation without reasonable suspicion, which "is unlawful because these tasks are 'aimed at detecting evidence of ordinary criminal wrongdoing' and are not 'ordinary inquir[ies] incident to the traffic stop.'" *United States v. Gorman*, 859 F.3d 706, 715 (9th Cir. 2017) (quoting *Rodriguez v. United States*, 135 S. Ct. 1609, 1615 (2015)). This motion is brought under the Fourth Amendment to the United States Constitution and Fed. R. Crim. P. 12, supported by the accompanying memorandum of law.

Mr. Aruiza-Andrade is charged with being an illegal alien in possession of a firearm, in violation of 18 U.S.C. § 922(g)(5)(A). Mr. Aruiza-Andrade was arraigned on the indictment on May 7, 2018. Trial is currently scheduled to take place on October 30, 2018.

The charges against Mr. Aruiza-Andrade are based on his alleged possession of a firearm that was seized by law enforcement agents during the course of a traffic stop and warrantless search of his vehicle. Mr. Aruiza-Andrade seeks suppression of the evidence because his arrest and detention exceeded the lawful scope of the traffic stop, which was unconstitutionally extended in order to perform a criminal investigatory stop without reasonable suspicion. Accordingly, the evidentiary fruits of this stop and subsequent search, including the discovery and seizure of the firearm, as well as all statements obtained from Mr. Aruiza-Andrade, must be suppressed.

### Factual Background

On Monday, March 19, 2018, at 10:44 p.m., Officer Jamie Broome and Senior Trooper Nugent of the Oregon State Police conducted a traffic stop of a vehicle driven by 25-year-old Julio Cesar Aruiza-Andrade. According to the police reports, Officer Broome conducted a traffic stop of Mr. Aruiza-Andrade's vehicle, a black 2007 Toyota Tacoma, because he "saw the driver fail to maintain his lane" and "had the driver on same direction radar as high as 68 MPH in the posted 55 MPH zone."[1] Officer Broome's traffic stop of Mr. Aruiza-Andrade's vehicle was videotaped with visual and auditory recordings.

The video recording demonstrates that Mr. Aruiza-Andrade maintained his lane while Officer Broome followed behind him. Officer Broome initiated the traffic stop by activating his emergency overhead lights. Mr. Aruiza-Andrade did not speed up or otherwise attempt to elude the officer, but rather promptly pulled his vehicle over to the shoulder of the freeway, using his right turn signal.

Officer Broome radioed police dispatch with the license plate number for Mr. Aruiza-Andrade's vehicle. Officers Broome and Nugent, dressed in police uniforms, approached the passenger's side door and at 10:45 p.m. Officer Broome made first contact with the driver. Officer Broome identified himself to Mr. Aruiza-Andrade, the driver and the sole occupant of the vehicle. Officer Broome informed Mr. Aruiza-Andrade that he was being recorded and advised him that he was being stopped because he failed to maintain his lane and was driving too fast. The officers noticed that Mr. Aruiza-Andrade did not speak English.

---

[1] Unless otherwise specified, the factual summary comes from police reports provided by the government in discovery, including the taped videos of the traffic stop. Times are estimated based on the reported time of the traffic stop and the duration into the recordings.

Officer Broome asked Mr. Aruiza-Andrade if he had a license, to which he responded "No." Officer Broome continued to ask Mr. Aruiza-Andrade whether he had any form of identification. Mr. Aruiza-Andrade offered to call his "esposa" (his wife) because she spoke some English. While Mr. Andrade-Aruiza called his wife, Officer Broome and Officer Nugent looked around inside the vehicle. They noticed a twelve-pack of beer that appeared to only have two beers left and one empty beer bottle in the backseat of the vehicle. Officer Broome then asked Mr. Aruiza-Andrade "Sir, how many cervezas?" Officer Broome attempted to translate the question into Spanish by saying "Caundo cervezas," which translates into "when beer?" Mr. Aruiza-Andrade responded "Three."

Three minutes into the stop, Officer Broome asked Officer Nugent to stand by the car, so he could retrieve his translator. Officer Broome attempted to use a device to translate the conversation into Spanish and also tried to explain to Mr. Aruiza-Andrade's wife why he had been stopped. Officer Nugent asked Mr. Aruiza-Andrade to turn the vehicle off and put the keys on the dashboard. Officer Broome then asked Mr. Aruiza-Andrade five separate times if he was willing to step out of the car to talk to him. However, Mr. Aruiza-Andrade remained in his vehicle because he did not understand the question.

At 10:51 p.m., nine minutes into the stop, Officer Broome said "Senior," as he backed away from the vehicle and gestured for Mr. Aruiza-Andrade to exit his vehicle. Mr. Aruiza-Andrade exited his vehicle and approached the officers with his left hand tucked into his pocket and his right hand holding his phone with his wife still on the line. Officer Broome asked Mr. Aruiza-Andrade to remove his hand from his pocket and grabbed at his arm when Mr. Aruiza-Andrade did not understand the demand. Mr. Aruiza-Andrade tried to hand his phone to Officer Broome who explained that he did not want to talk to Mr. Aruiza-Andrade's wife. Mr. Aruiza-

Andrade hung up the phone and tried to tuck both his hands into his pockets, at which point both officers grabbed at his arms and demanded in English that he keep his hands out of his pockets.

While holding Mr. Aruiza-Andrade's arms out of his pockets, Officer Broome asked if he could perform a search of Mr. Aruiza-Andrade, and Officer Nugent asked him if he had any guns or knives on his person. Mr. Aruiza-Andrade complied with the search and the officers released their hold of him. Officer Broome walked back to the front of his patrol car and motioned for Mr. Aruiza-Andrade to follow. Mr. Aruiza-Andrade did not stumble when he exited his vehicle nor while he walked back to the patrol car. Although he spoke in Spanish, Mr. Aruiza-Andrade did not slur his speech.

Officer Broome asked Mr. Aruiza-Andrade to sit on the hood of his patrol car and retrieved a translating device. Officer Broome then explained the device was not working properly. Mr. Aruiza-Andrade's wife called back and Officer Broome told him that he could answer the call. Officer Broome asked Mr. Aruiza-Andrade's wife if she could ask Mr. Aruiza-Andrade in Spanish if he was willing to take a standardized field sobriety test. She explained that she did not have anyone who could speak English to translate for her at the time. Mr. Aruiza-Andrade's wife, could not translate the question either.

Officer Broome wrote in his police report that he was able to get Mr. Aruiza-Andrade to consent to perform a standardized field sobriety test, yet "[t]he only test [Officer Broome] was able to perform was the horizontal nystagmus test." Officer Broome believed that he had obtained Mr. Aruiza-Andrade's consent to perform the test and began the horizontal nystagmus test at 10:56 p.m., twelve minutes into the stop. Officer Broome wrote in his police report that he observed "6 out of 6 clues on this test." Three minutes later, Officer Broome placed handcuffs on Mr. Aruiza-

Andrade and informed him that he was under arrest for Driving Under the Influence of Intoxicants (DUII) and Failure to Carry or Present a Driver's License.

Officer Broome put latex gloves on and searched Mr. Aruiza-Andrade's person. Mr. Aruiza-Andrade asked Officer Broome what was going to happen to his vehicle and Officer Broome explained that he would have it towed. Officer Broome placed Mr. Aruiza-Andrade in the back of his patrol vehicle at 11:01 p.m. A few seconds later the audio recording stops. With Mr. Aruiza-Andrade in the back seat of the patrol vehicle, both officers walked back to his truck and began searching for "evidence of the crimes."

The search of Mr. Aruiza-Andrade's vehicle began at 11:02 p.m. During the search, the officers dumped a small amount of liquid out of a bottle onto the side of the road.  They walked around the vehicle and searched in the bed of the truck, underneath the vehicle, and inside the vehicle entering through both the rear and front passenger doors. Officer Broome wrote in his police report that he "noticed some yellow wires coming out of [the] dash that were connected to a small heavy item." However, the wires turned out to be connected to a speaker system in the vehicle.

Officer Broome also wrote in his police report that he noticed "a card on the roof of the interior of [Mr. Aruiza-Andrade's] vehicle by the driver's side that [he] recognized as Jesus Malverde." He explained that these cards are good luck charms that are "often carried by drug traffickers for protection." In addition, Officer Broome noted in his police report that he did not see any luggage in the vehicle and explained that he knows from his training and experience that it is uncommon for people to take long trips without packing luggage. Officer Broome also wrote that there was a socket wrench on the passenger seat of the vehicle, and he recalled that he found a socket bit in Mr. Aruiza-Andrade's pocket when he had searched him. Officer Broome explained

that from his training and experience he knows that "drug traffickers attempt to conceal drugs in hidden compartments in vehicles and [he] thought the socket could be related to that." It is unclear whether Officer Broome noticed all of this during his initial search or during the subsequent searches of Mr. Aruiza-Andrade's person and vehicle.

At 11:05 p.m., Officer Broome called another officer for backup. Three minutes later, at 11:08 p.m., he radioed dispatch and requested a K-9 for assistance in the search of Mr. Aruiza-Andrade's vehicle. Officer Broome then approached Mr. Aruiza-Andrade and explained that he had to read him his *Miranda* rights in English because he did not have them in Spanish. The officers then questioned Mr. Aruiza-Andrade about the yellow and red wires they found in his car. The officers were unable to communicate clearly and had to show Mr. Aruiza-Andrade a photo of the wires. Mr. Aruiza-Andrade explained that the wires were attached to a speaker system, which turned out to be true.

At 11:13 p.m., Officer Broome and Officer Nugent left Mr. Aruiza-Andrade in the back of the patrol car and had a conversation with the audio recording still on. Officer Broome stated his frustration with wanting to get Mr. Aruiza-Andrade's "BAC" before it dropped but also wanting to continue with an "on scene drug investigation." A minute later, around 11:14 p.m., another officer arrived on the scene. While the three officers discussed the situation, Mr. Aruiza-Andrade attempted to get the officers' attention from the back of the patrol car, where he had been sitting for nearly fourteen minutes. At 11:20 p.m., Officer Nugent walked by Mr. Aruiza-Andrade, who tried again to get the officer's attention. Mr. Aruiza-Andrade asked to talk to his wife and Officer Nugent explained that they could probably call her.

At 11:22 p.m., Officer Munoz and his K-9, Mattis, arrived on the scene, approximately thirty-eight minutes into the traffic stop. At this time, there were now four officers and a K-9 on

scene. Officer Munoz and his K-9 then walked around the vehicle to perform a dog sniff of both the exterior and interior near the passenger's side. Officer Broome explained in his police report that "Officer Munoz informed [him] that Mattis alerted to the vehicle on the passenger side."

Following the dog sniff, at 11:26 p.m., Officer Broome asked Mr. Aruiza-Andrade for consent to search his vehicle. Without answering the question, Mr. Aruiza-Andrade asked to call his wife again and tried to explain that he did not understand English. Officer Broome then asked Mr. Aruiza-Andrade to read the "Oregon State Police Notice and Consent to Search Multi-Lingual Form." After Officer Broome gave Mr. Aruiza-Andrade time to read the form, which is in both English and Spanish, Officer Broome asked Mr. Aruiza-Andrade if he had his consent to search the vehicle. Mr. Aruiza-Andrade made a confirming noise and then again asked to speak to his wife.

Officer Broome explained to the other officers that he had gained consent to search the vehicle. Officer Broome took Mr. Aruiza-Andrade's handcuffs off at 11:31 p.m., forty-five minutes into the stop, so he could sign the consent to search form. Before signing the form, Mr. Aruiza-Andrade asked Officer Broome about the form, and Officer Broome explained in English, "That's you if you're giving me consent to search." Mr. Aruiza-Andrade continuously asked to call his wife during the stop. After Mr. Aruiza-Andrade signed the form, an officer began questioning Mr. Aruiza-Andrade about whether he had drugs in the vehicle.

From 11:32 p.m. to 11:42 p.m. officers continued to search the vehicle. Officer Broome wrote in his police report:

> Officer Munoz pulled the glove box down and he alerted me to a concealed handgun. He showed me a black handgun that was concealed behind the glove box that was visible once pulled down and detached . . . At that point, I ended the search on scene and seized the vehicle to apply for a search warrant.

(Police Report, Bates No. 0000074.)  Nearly one hour into the traffic stop, at 11:44 p.m., Officer Smyth placed Mr. Aruiza-Andrade back into handcuffs and escorted him out of the patrol car. Officer Smyth searched Mr. Aruiza-Andrade's person and placed him in the back of his patrol car. Officer Smyth then escorted Mr. Aruiza-Andrade to the Jackson County Jail to process him for DUII. Mr. Aruiza-Andrade was lodged without incident. Officer Broome wrote in his police report that Officer Smyth "was able to get a final BAC of 0.00."

On March 20, 2018, Officer Broome presented his affidavit for a search warrant and his search warrant to Judge Mejia. Judge Meija granted the search warrant and Officer Broome executed the warrant during his shift on March 20, 2018, at 5:37 p.m. A firearm was located during the search. Officer Broome went to the Jackson County Jail to meet with Mr. Aruiza-Andrade. During their conversation Mr. Aruiza-Andrade made several incriminating statements.

## Argument

### A. Officer Broome Violated Mr. Aruiza-Andrade's Fourth Amendment Right Not To Be Subject To An Unreasonable Search And Seizure By Unconstitutionally Extending The Traffic Stop To Perform A Drug Investigation Without Reasonable Suspicion.

"The security of one's privacy against arbitrary intrusion by the police—which is at the core of the Fourth Amendment—is basic to a free society." *Wolf v. Colorado*, 338 U.S. 25, 27 (1949). The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." Searches and seizures conducted without prior approval by a judge or magistrate are per se unreasonable, "subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967); *see Georgia v. Randolph*, 547 U.S. 103, 109 (2006) (exceptions to the warrant requirement are "jealously and carefully drawn") (quoting *Jones v. United States*, 357 U.S. 493, 499 (1958)). It is the government's burden to establish that a warrantless seizure is justified. *See*

*Coolidge v. New Hampshire*, 403 U.S. 443, 455 (1971); *United States v. Jeffers,* 342 U.S. 48, 95 (1951).

Federal courts have repeatedly emphasized the strict constitutional limits applicable to traffic stops. As the Supreme Court held in *Rodriguez v. United States*, 135 S. Ct. at 1614, a "seizure for a traffic violation justifies a police investigation of *that violation*" (emphasis added). As in the context of a *Terry*-stop, [2] "the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission' - to address the traffic violation that warranted the stop." *Rodriguez*, 135 S. Ct. at 1615 (citing *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)); *see also Florida v. Royer*, 460 U.S. 491, 500 (1983) ("The scope of the detention must be carefully tailored to its underlying justification.").

In *Rodriguez,* the Court held that police officers conducting a traffic stop investigation may only engage in focused inquiries directed toward investigating the basis for the stop and issuance of a citation, and ascertaining the roadworthiness of the driver and his vehicle:

> Beyond determining whether to issue a traffic ticket, an officer's mission typically includes checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance. These checks serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly.

135 S. Ct. at 1615 (citations omitted). In so holding, the *Rodriguez* Court found that a traffic stop scene investigation for other crimes, including the taking of safety precautions to facilitate such investigation, must be independently justified by reference to facts other than those that justified the initial traffic stop. *Id*. at 1615; *accord United States v. Kaguras*, 183 Fed. Appx. 783, 786 (10th Cir. 2006)("A traffic stop that is extended without consent, even for a relatively

---

[2] The Supreme Court has opined that a routine traffic stop is "analogous" to what is known as a *"Terry* stop." *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984).

short duration, is unconstitutional absent a reasonable and articulable suspicion justifying the further detention.").

Absent such independent justification, extending a traffic stop beyond the time reasonably needed to complete the traffic stop investigation and citation process is unconstitutional. The Supreme Court wrote:

> We hold that a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures. A seizure justified only by a police-observed traffic violation, therefore, "become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission" of issuing a ticket for the violation.

*Rodriguez,* 135 S. Ct. at 1612 (citation omitted). The *Rodriguez* Court reasoned that "[l]ike a *Terry* stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop[.]" *Id.* at 1614. "Because addressing the infraction is the purpose of the stop, it may 'last no longer than is necessary to effectuate th[at] purpose.'" *Id.* Accordingly, any "[a]uthority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.; see also United States v. Chavez-Valenzuela*, 268 F.3d 719, 724 (9th Cir. 2001) (Given that the scope of an investigative detention must be carefully tailored to its underlying justification, "[a]n officer must initially restrict the questions he asks during a stop to those that are reasonably related to the justification for the stop."); *United States v. Digiovanni,* 650 F.3d 498, 507 (4th Cir. 2011) ("In the context of traffic stops, police diligence involves requesting a driver's license and vehicle registration, running a computer check, and issuing a ticket. If a police officer seeks to prolong a traffic stop to allow for investigation into a matter outside the scope of the initial stop, he must possess reasonable suspicion or receive the driver's consent.") (citations omitted).

The *Rodriguez* Court found that "the Government's endeavor to detect crime in general or drug trafficking in particular" cannot justify prolonging an ordinary traffic stop to conduct a canine narcotic investigation. 135 S. Ct at 1616. Such "[o]n-scene investigation into other crimes . . . detours from an officer's traffic-control mission." *Id.* at 1611*; see also United States v. Gorman,* 859 F.3d 706, 715 (9th Cir. 2017) ("We have held that prolonging a traffic stop to perform an ex-felon registration check or a dog sniff is unlawful because these tasks are 'aimed at detecting evidence of ordinary criminal wrongdoing' and are not 'ordinary inquir[ies] incident to the traffic stop.'") (citations omitted); *United States v. Wendfeldt,* 58 F.Supp.3d 1124, 1133 (D. Nev. 2014) (police officer's "additional pointed questions regarding whether [defendant] had illegal contraband, and then directing him to stand to the side of the patrol vehicle when [defendant] refused to consent to a search, were not *de minimis"* nor was a subsequent two-and-a-half minute delay for a dog sniff to occur).

In *United States v. Digiovanni,* 650 F.3d at 498, the court evaluated a traffic stop that raised issues similar to those presented here. The *Digiovanni* court found that the police had unreasonably extended the traffic stop by turning it into a drug investigation without reasonable suspicion. *Id.* at 515. In so finding, the court summarized the relevant factors to be considered in determining whether the officer acted with due diligence in completing the purposes of the traffic stop:

> [T]he reasonableness of a police officer's actions during a traffic stop turns on his diligence in accomplishing the purposes of stop, that is, investigating whether a traffic infraction occurred and issuing a ticket. . . . [D]iligence is not present where the police officer "definitely abandoned the prosecution of the traffic stop and embarked on another sustained course of investigation" or where the unrelated questions "constituted the bulk of the interaction" between the police officer and the defendant.

*Id.* at 508-09 (citations omitted).

Officer Broome arrested Mr. Aruiza-Andrade for Driving Under the Influence of Intoxicants in violation of ORS 813.010 and Failure to Carry or Present a License in violation of

ORS 807.570.  With respect to Driving Under the Influence of Intoxicants contrary to ORS 813.010, an officer's stop and arrest violates the Fourth Amendment if an objective existence of probable cause does not exist. *McKay v. Morris*, No. 10-35708, 2011 WL 2452113, at *1 (9th Cir. June 21, 2011). An officer is found to have probable cause when under the totality of the circumstances a prudent person would believe there was a fair probability that the suspect had committed a crime. *Peng v. Mei Chin Penghu*, 335 F.3d 970, (9th Cir. 2003).

In *United States v. Stanton*, the Ninth Circuit determined that there was a fair probability that a suspect had committed the crime of DUII. 501 F.3d 1093, 1101 (9th Cir. 2007). In *Stanton*, the totality of the circumstances known to the arresting officer included the defendant's watery and bloodshot eyes, unsteady balance, slow speech, and strong odor of alcohol. *Id.* In addition, preliminary breath tests indicated that the defendant's blood alcohol content was above the legal limit and the arresting officer observed the defendant fail two field sobriety tests. *Id.*

Here, the totality of the circumstances does not support that a prudent person would believe that Mr. Aruiza-Andrade was driving while under the influence of intoxicants. Officer Broome stopped Mr. Aruiza-Andrade's vehicle for allegedly failing to maintain its lane and speeding. The vehicle was not stopped for erratic driving and Mr. Aruiza-Andrade promptly pulled over using his turn signal when he was stopped. When the officers approached the vehicle, they noticed a moderate smell of alcohol, beer in the back of the vehicle, and that Mr. Aruiza-Andrade's eyes were bloodshot and watery. Even if Mr. Aruiza-Andrade had told the officers that he had been drinking, he did not demonstrate impaired mental or physical faculties. Mr. Aruiza-Andrade did not slur his speech or lose his balance. Under the totality of these circumstances, a prudent person would not believe that Mr. Aruiza-Andrade's physical or mental faculties were adversely affected to a noticeable degree, and thus would not have believed that he had committed a crime.

However, Officer Broome believed that based on his observations he had probable cause to subject Mr. Aruiza-Andrade to a field sobriety test.[3] Because the totality of the circumstances support that Officer Broome did not have probable cause, he violated Mr. Aruiza-Andrade's right to be free from unreasonable search and seizure. Without the horizontal gaze nystagmus test that Officer Broome subjected Mr. Aruiza-Andrade to, there is no evidence of impairment and Officer Broome could not have detained Mr. Aruiza-Andrade. Moreover, Officer Broome unlawfully extended the traffic stop by searching Mr. Aruiza-Andrade's vehicle after he had arrested him for DUII. After Officer Broome located beer in the vehicle (the evidence of the crime that Mr. Aruia-Andrade had been arrested for), officers continued to search the vehicle intermittently for an additional forty minutes.

With respect to Failure to Carry or Present a License, in violation of ORS ORS 807.570, the statutory limits on when a stopped motorist may be detained under Oregon's Failure to Display statute were addressed in *United States v. Izguerra-Robles,* 660 F.Supp.2d 1202 (D. Or. 2009). There the government contended that the defendant was lawfully arrested and placed in handcuffs for failing to display his driver's license. Judge Haggerty rejected the government's argument and found that "[t]he scope of this arrest exceeded that authorized by ORS 807.570" because "the police should have verified [defendant's] identity, issued him a citation, and sent him on his way." *Id.* at 1207. In so holding, the Court emphasized that the Oregon Failure to Display statute authorizes a police officer to detain a person "'only for such time as reasonably necessary to investigate and verify the person's identity,'" and "does not allow 'officers to use it as a ploy to conduct otherwise unauthorized searches.' Once the person's identity is verified, 'detention is no

---

[3] Officer Broome did not provide any further specific reasons as to why he believed he had probable cause to submit Mr. Aruiza-Andrade to field sobriety tests.

longer reasonably necessary and the individual must be released.'" *Id.* (citations omitted); *see also United States v. Washington*, 739 F. Supp. 546, 549, 551 (D. Or. 1990) (finding that where the officer was "satisfied as to [defendant's] identity before he asked [defendant] for permission to search the trunk of [his] vehicle," defendant "was detained beyond the time allowed by ORS 807.570").

Not only did Officer Broome's arrest and detention of Mr. Aruiza-Andrade directly violate ORS 807.570(4)'s restriction on the lawful authority to detain a person, but it also violated Mr. Aruiza-Andrade's Fourth Amendment right to be free from unreasonable search and seizure. Officer Broome obtained identification from Mr. Aruiza-Andrade early on in their interaction. While Officer Broome wrote in his police report that he could "not confirm whether [the Mexico identification] card was a valid card of true identity" he did not inquire further into identification, which was required to justify Mr. Aruiza-Andrade's detainment. Thus, because Officer Broome had reason to believe that he had already obtained identification from the Mexico identification card, Mr. Aruiza-Andrade was unlawfully detained for Failure to Carry or Present a License. In addition, even if Officer Broome believed the card to be false identification, he failed to investigate Mr. Aruiza-Andrade's identification in a reasonable amount of time as provided by ORS 807.570(4) and therefore unlawfully detained Mr. Aruiza-Andrade.

Officer Broome violated Mr. Aruiza-Andrade's Fourth Amendment right when he extended the stop beyond the time necessary to complete the mission of the traffic stop. Officer Broome unlawfully arrested Mr. Aruiza-Andrade based on DUII and Failure to Carry or Present a License and then searched the vehicle numerous times with up to four officers and a K-9. Officer Broome expressly stated his frustrations with not knowing how he should have handled the two separate issues (the possible DUII that he unlawfully extended into an on-scene drug investigation)

while Mr. Aruiza-Andrade sat handcuffed in the back of the patrol vehicle. Mr. Aruiza-Andrade sat in the patrol car for nearly an hour before being taken down to Jackson County Jail to be processed for DUII. The DUII charge was subsequently dropped when Officer Smyth determined Mr. Aruiza-Andrade's blood alcohol content to be 0.00.

Officer Broome also failed to gain lawful consent to search Mr. Aruiza-Andrade's vehicle. The voluntariness of consent requires a court to look at the totality of the circumstances. *United States v. Higareda-Santa Cruz*, 826 F. Supp. 355, 359 (D. Or. 1993).

> The Ninth Circuit has instructed courts to consider five factors in this determination: (1) whether the defendant was in custody; (2) whether the arresting officer had his gun drawn; (3) whether the defendant was given *Miranda* warnings; (4) whether officers notified the defendant he had a right not to consent; and (5) whether the defendant was told officers could obtain a search warrant. No single factor is controlling.

*United States v. Abarza*, 143 F. Supp. 3d 1082, 1093 (D. Or. 2015), *decision clarified on reconsideration*, 199 F. Supp. 3d 1270 (D. Or. 2016)(internal citations omitted).

Mr. Aruiza-Andrade was in custody when the officers asked him to sign a consent to search form. The officers had to remove his handcuffs in order for him to sign the form. Mr. Aruiza-Andrade had been sitting in the back of a police car for twenty-seven minutes at this point. While the arresting officer did not have his gun drawn, there were four officers and a K-9 on scene when Mr. Aruiza-Andrade was asked for his consent. Mr. Aruiza-Andrade had been read his *Miranda* rights in English nearly twenty minutes prior to the officer asking for his consent. Mr. Aruiza-Andrade speaks and understands very little English, as is apparent in the recordings. Even if the Spanish consent to search form accurately translates into English, there is no proof that Mr. Aruiza-Andrade understood that he had a right not to consent or that officers could obtain a search warrant. Thus, Mr. Aruiza-Andrade did not voluntarily consent to the search of his vehicle.

When Officer Broome unlawfully detained Mr. Aruiza-Andrade and expanded the traffic stop in order to conduct an unrelated drug investigation, he exceeded the mission and lawful scope of the traffic stop and thereby violated Mr. Aruiza-Andrade's Fourth amendment rights. [4]

**B. Mr. Aruiza-Andrade Did Not Knowingly And Intelligently Waive His *Miranda* Rights Prior To Being Questioned By The Police Officers And His Statements Must Be Suppressed.**

According to the police reports, Mr. Aruiza-Andrade made a number of incriminating statements while detained, following his arrest. Mr. Aruiza-Andrade did not knowingly, intelligently, and voluntarily waive his *Miranda* rights. *See Missouri v. Seibert*, 542 U.S. 600, 608 n.1 (2004) (noting that the government must show by a preponderance of the evidence that a valid *Miranda* waiver was given and that any statements were given voluntarily); *see also Miranda v. Arizona*, 384 U.S. 436, 475 (1966) ("[A] heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel."). Any claim of such waiver must establish that the waiver was made by Mr. Aruiza-Andrade with a full understanding of "the nature of the right being abandoned and the consequences of the decision to abandon it" and "the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception." *Moran v. Burbine*, 475 U.S. 412, 421 (1986).

---

[4] The level of intrusion during a stop, similar to that displayed here, also supports that the probable cause requirement had been triggered. *See e.g. United States v. Lopez-Arias*, 344 F.3d 623, 627-28 (6th Cir. 2003) (transporting vehicle occupants away from the scene of the stop requires probable cause); *United States v. Rodriguez*, 869 F.2d 479, 483 (9th Cir. 1989); *United States v. Strickler*, 490 F.2d 378, 380-81 (9th Cir. 1974); *see also United States v. Bailey*, 743 F.3d 322, 340 (2d Cir. 2014) (holding that a lawful detention-incident-to-search became unlawful at the moment that police handcuffed the individual, because the police had already searched the individual for weapons and the government never argued that he was a flight risk); *Longshore v. State*, 399 Md. 486, 514 (Md. Ct. App. 2007) (holding that handcuffing a suspect turns an investigative stop into an arrest and thus requires probable cause absent "special circumstances," such as a reason to believe the suspect will flee or endanger the officer).

Where, as here, statements are obtained as a result of an unlawful arrest and detention, the "question in such a case is whether, granting establishment of the primary illegality, the evidence to which [the] instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun v. United States*, 371 U.S. 471, 488 (1963) (internal quotation marks omitted) (finding that evidence admitted at defendant's trial was inadmissible as the fruits of unlawful arrests or searches)."[5]

In determining the validity of a *Miranda* waiver, courts consider the "totality of the circumstances" surrounding the interrogation. *Moran,* 475 U.S. at 421 (citation omitted). The "background, experience, and conduct of the accused" bears on this inquiry. *North Carolina v. Butler*, 441 U.S. 369, 374–75 (1979) (citing *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)). Furthermore, "courts indulge every reasonable presumption against waiver of fundamental constitutional rights" and "do not presume acquiescence in the loss of fundamental rights." *Zerbst*, 304 U.S. at 464 (internal citations omitted).

The United States District Court for the District of Oregon has held that where a Spanish speaking defendant's grasp of the English language is "rudimentary," a *Miranda* warning given to that defendant in English does not validly provide waiver. *Higareda-Santa Cruz*, 826 F. Supp. at

---

[5] The Oregon Supreme Court has similarly applied an exclusionary rule remedy to violations of Oregon statutes governing investigative stops of individuals and vehicles. *See State v. Porter*, 312 Or. 112, 121 (1991) ("The trial court should have suppressed the evidence obtained in violation of ORS 810.410(3), because the object of that statute is to define the authority of officers to respond to a traffic infraction.") For purposes of federal law, the reasonableness of police search activity is undermined by failure to comply with state law regarding police officer authority and activity. *See United States v. Mota*, 982 F.2d 1384, 1388 (9th Cir. 1993) ("[I]n evaluating a custodial arrest executed by state officials, federal courts must determine the reasonableness of the arrest in reference to state law governing the arrest."); *see also United States v. Shepherd*, 21 F.3d 933, 936 (9th Cir. 1994) ("We look to state law to determine the lawfulness of an arrest by a state officer for a state offense.").

359.  Like the defendant in *Higareda-Santa Cruz*, Mr. Aruiza-Andrade's English is at best rudimentary. Mr. Aruiza-Andrade was not provided with the Spanish *Miranda* card and was *Mirandized* in English.  Moreover, Mr. Aruiza was removed from his vehicle by uniformed police officers, driving a marked police car whose lights remained activated throughout the traffic stop. He was quickly placed in handcuffs on a busy freeway and informed that he was under arrest for Driving Under the Influence of Intoxicants and Failure to Carry or Present a License.

All evidence and statements derived following the unlawful extension of the traffic stop should be suppressed because there is a clear connection between the illegal detention, extension of the stop, and the tainted evidence. In *Izguerra-Robles,* this Court found, under a similar factual scenario, that there was a "causal connection" between "the illegal action and the tainted evidence" and that suppression of the evidence was justified. 660 F.Supp.2d at 1207. Like Mr. Aruiza-Andrade here, the defendant in *Izguerra-Robles* was arrested and placed in handcuffs for violating Oregon's Failure to Display or Carry a License statute and read his *Miranda* rights. The *Izguerra-Robles* Court found that "[b]ecause defendant was unlawfully arrested, the drugs found in his car as a result of the subsequent search, as well as the incriminating statements he made at the police station, can be suppressed as 'fruit of the poisonous tree.'" *Id.* at 1207 (citation omitted).  The Court emphasized that "both the discovery of the drugs and the defendant's subsequent statements occurred as a direct result of defendant's illegal arrest and that there were no intervening circumstances indicating that the evidence should not be suppressed." *Id.* at 1208; *see also Washington*, 739 F.Supp.2d at 550-51 (this Court held that where defendant "was detained beyond the time allowed by ORS 807.570," defendant "did not consent to a prolonged detention" and police search exceeded the scope of the consent given by the defendant); *United States v. Washington,* 387 F.3d 1060, 1072 (9th Cir. 2004) (signed consent form found to be invalid where

it was tainted by illegal conduct): *Abarza*, 143 F.Supp.3d at 1094-95 (where police unreasonably extended the scope of the traffic stop, defendant's consent to search of his vehicle was not voluntary); *Rodgers*, 347 Or. at 626, 630 (police officer's "questions and request to search the car were not part of the traffic investigation" and "given the temporal proximity between the illegal detention" and the consent to search and "the absence of any other intervening circumstances," the consent to search was "a product of the unlawful seizure" and the evidence obtained during the search must be suppressed).

### Conclusion

For the reasons set forth above, Mr. Aruiza-Andrade moves this Court for an order excluding as evidence all items seized subsequent to the illegal seizure of his person and search of his vehicle. The evidence obtained from the illegal search of Mr. Aruiza-Andrade's vehicle, as well as Mr. Aruiza-Andrade's statements, must be suppressed as fruits of the police officer's violation of his Fourth and Fourteenth Amendment rights. The evidence sought to be excluded, both physical and verbal, is the direct product of the illegal stop and detention of Mr. Aruiza-Andrade.

It was Officer Broome's suspicion that prolonged the stop beyond the time needed to complete the moving vehicle infraction ticket. The purpose of this seizure and subsequent search was not to secure evidence of the traffic violation, but evidence of another suspected crime. In order to pass constitutional muster, the police officer needed specific and articulable facts to justify an objectively reasonable suspicion that Mr. Aruiza-Andrade was in possession of controlled substances or firearms at the time he was arrested and questioned by the officer, which Officer Broome lacked. Accordingly, the seizure and detention of Mr. Aruiza-Andrade was

constitutionally unlawful, and all evidence seized and statements obtained as a result of his arrest, search, and seizure should be suppressed.

Respectfully submitted this October 16, 2018.


 */s/ Brian Butler*
Brian Butler
Assistant Federal Public Defender