IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVISION

UNITED STATES OF AMERICA,

                                                                        No. 1:18-cr-00214-MC

         v.                                                        **OPINION AND ORDER**

JULIO CESAR ARUIZA-ANDRADE,

        Defendant.

McSHANE, District Judge.

This matter comes before the Court on Defendant's Motion to Suppress. ECF No. 21. An evidentiary hearing was held on this motion on January 16, 2019. ECF No. 31.

### BACKGROUND

During the evening of March 19, 2018, Oregon State Police Trooper Jamie Broome and Senior Trooper Nugent were driving a marked OSP patrol car on Interstate 5 in Medford, Oregon. At approximately 10:41 p.m., Trooper Broome saw a black 2007 Toyota Tacoma pickup truck with California license plates cross the white fog line while traveling northbound. Gov. Ex. 1 (OSP dashcam video), at 00:01:55-00:01:57. The posted speed limit for that stretch of Interstate 5 is 55 mph.[1] Trooper Broome's radar indicated that the vehicle was traveling at 68 mph.

Trooper Broome activated his patrol car's overhead lights and sirens and initiated a traffic stop at approximately 10:44 p.m. Gov. Ex. 1, at 00:02:45. The pickup truck came to a

---
[1] At the hearing, Trooper Broome testified that the speed limit on Interstate 5 drops from 65 mph to 55 mph upon entering the Medford city limits, not far from where Trooper Broome encountered Mr. Aruiza-Andrade.

prompt and safe stop on the side of the Interstate near mile post 29. *Id.* at 00:03:03; Gov. Ex. 3, at 4. At the time of the stop, the vehicle's driver and sole occupant was Defendant Julio Cesar Aruiza-Andrade.

The troopers approached the vehicle and contacted Mr. Aruiza-Andrade. The troopers identified themselves and told Mr. Aruiza-Andrade that the encounter was being recorded. Upon making contact, it quickly became apparent to the troopers that Mr. Aruiza-Andrade spoke very little English. The troopers spoke little or no Spanish, which rendered communication a difficult and laborious process throughout the subsequent stop.

Trooper Broome attempted to explain that he had stopped Mr. Aruiza-Andrade for crossing outside of his lane and for speeding. Trooper Broome asked Mr. Aruiza-Andrade if he had a driver's license, to which Mr. Aruiza-Andrade responded "No." Gov. Ex. 1, at 00:04:15. Trooper Broome asked Mr. Aruiza-Andrade if he had any identification. Mr. Aruiza-Andrade produced a Mexican consular identification card, which gave his name as Gaspar Jimenez-Hernandez.[2] At the hearing, Trooper Broome testified that he was suspicious of the identification card, but that he was not aware of any mechanism for checking the validity of foreign identification cards.

Upon approaching the vehicle, Trooper Broome testified that he could smell an odor of alcohol. Trooper Broome testified that Mr. Aruiza-Andrade's eyes were bloodshot and watery. Trooper Broome also saw an open twelve-pack of beer in the back seat of the pickup truck. There were two unopened beers left in the twelve-pack and a partially-consumed beer lying on the floor of the backseat.

---

[2] Although this later proved to be a false identification, Trooper Broome testified that he was not aware of that fact at the time of the stop.

Trooper Broome attempted to ascertain if Mr. Aruiza-Andrade had been drinking by asking "Sir, how many cervezas [beers]?" Gov. Ex. 1, at 00:05:06. Mr. Aruiza-Andrade did not appear to understand the question and when Trooper Broome repeated "Cervezas?" Mr. Aruiza-Andrade responded "Ah, si [yes]." Gov. Ex. 1, at 00:05:16. Trooper Broome attempted to translate "how many" into Spanish. Trooper Broome, who does not speak Spanish, incorrectly presented the question using the interrogative "Quando?" (which translates as "When?")[3] Gov. Ex. 1, at 00:05:23. Mr. Aruiza-Andrade answered "Tres," (which translates as "three"). *Id.* Trooper Broome only later learned that he had incorrectly translated his question and testified that, at the time, he understood Mr. to have admitted to consuming three beers.

Trooper Broome retrieved his cellphone from the patrol car and unsuccessfully attempted to use a translator app to communicate with Mr. Aruiza-Andrade. Mr. Aruiza-Andrade also attempted to facilitate communication by calling his wife, who spoke some English, on his cellphone. The troopers tried to explain the reason for the stop to Mrs. Aruiza-Andrade, but her command of English was too limited for her to serve as an effective translator.

Approximately five minutes after the stop, the troopers directed Mr. Aruiza-Andrade to turn off the vehicle and place his keys on the dashboard. Gov. Ex. 1, at 00:07:52. Trooper Broome then asked Mr. Aruiza-Andrade to step out of the car, which Mr. Aruiza-Andrade did. *Id.* at 00:08:38-00:09:06.

When Mr. Aruiza-Andrade stepped out of the car, he was holding his cellphone to his ear with one hand and had the other hand in his front pocket. The troopers directed Mr. Aruiza-Andrade to take his hands out of his pockets. Mr. Aruiza-Andrade did not appear to understand, so Trooper Broome took Mr. Aruiza-Andrade's arm and pulled it from the pocket, repeating that Mr. Aruiza-Andrade should keep his hands out of his pockets. Mr. Aruiza-Andrade then hung

---

[3] "How many" is "cuántos" in Spanish.

up his cellphone and attempted to place both hands in his pockets. The troopers grabbed Mr. Aruiza-Andrade's arms and again repeated that he should not place his hands in his pockets. Trooper Broome patted down Mr. Aruiza-Andrade and asked if Mr. Aruiza-Andrade had any weapons on his person. Mr. Aruiza-Andrade answered "No." Gov. Ex. 1, at 00:09:43.

Through a combination of verbal instructions and hand gestures, the troopers led Mr. Aruiza-Andrade to the front of the cruiser and directed him to sit on the vehicle's front guard. Gov. Ex. 1, at 00:09:57. Trooper Broome once again attempted to use a translator app to communicate, but without success.

At this point, Mrs. Aruiza-Andrade called Mr. Aruiza-Andrade's cellphone and Trooper Broome told Mr. Aruiza-Andrade that he could answer the call. Gov. Ex. 1, at 00:11:29. While on the phone with his wife, Mr. Aruiza-Andrade exhibited some confusion about where he was and asked Trooper Broome if he was in Shasta. Trooper Broome responded that they were in Medford.[4] *Id.* at 00:11:42.

Trooper Broome asked Mr. Aruiza-Andrade to put his wife on speakerphone so that he could speak with her. Gov. Ex. 1, at 00:11:56. Over the speakerphone, Trooper Broome told Mrs. Aruiza-Andrade that he was concerned that Mr. Aruiza-Andrade had been drinking and was not fit to drive. *Id.* at 00:12:07. Trooper Broome asked Mrs. Aruiza-Andrade to translate a request for Mr. Aruiza-Andrade to perform standard field sobriety tests ("FST"), but Mrs. Aruiza-Andrade was unable to translate the request. *Id.* at 00:12:46-00:13:03.

Trooper Broome attempted to ask Mr. Aruiza-Andrade if he would perform the FST through a combination of verbal instructions and pantomimed gestures. Gov. Ex. 1, at 00:13:17-00:13:34. At the end of his demonstration, Trooper Broome asked "Comprende or no? Do you

---

[4] As discussed at the hearing, Shasta, California is just over 150 miles from Medford, Oregon.

understand?" to which Mr. Aruiza-Andrade answered "Si." *Id.* at 00:13:33-00:13:47. Trooper Broome accepted this response as consent to perform field sobriety tests.

Trooper Broome performed the horizontal gaze nystagmus ("HGN") test. In the HGN test, the driver must keep his head still and follow a moving object with his eyes while the officer watches for involuntary eye movements. Although Trooper Broome had some difficulty explaining, through pantomime and English, that Mr. Aruiza-Andrade should keep his head straight, Trooper Broome was eventually able to complete the HGN test. Gov. Ex. 1, at 00:13:47-00:17:05. At the hearing, Trooper Broome testified that he observed six out of six clues during the HGN, which was indicative of impairment. Trooper Broome testified that he did not ask Mr. Aruiza-Andrade to perform any of the other standard FST because of the language barrier.

Approximately fourteen minutes after the initial stop, Trooper Broome placed Mr. Aruiza-Andrade under arrest for Driving Under the Influence of Intoxicants ("DUII") and Failure to Carry/Present a Driver's License. Gov. Ex. 1, at 00:17:09. Mr. Aruiza-Andrade was handcuffed and Trooper Broome performed a pat-down search before placing Mr. Aruiza-Andrade in the back seat of the patrol car. During the search, Trooper Broome found a socket wrench bit in Mr. Aruiza-Andrade's pocket.

The troopers then searched Mr. Aruiza-Andrade's pickup truck. Gov. Ex. 1, at 00:20:06-00:26:40. During the search of the vehicle, the troopers found an item connected by wires running under the dashboard. The troopers were not initially able to identify the item. When the troopers showed Mr. Aruiza-Andrade a picture of the item, he told them it was part of the truck's sound system. *Id.* at 00:31:10. In addition to the wiring, Trooper Broome noticed that the dashboard was not flush with its fittings, which led him to believe that the truck's dashboard had

been disassembled at some point. The troopers also found a socket wrench set and a card depicting Jesús Malverde. Gov. Ex. 3, at 5. In his later search warrant affidavit, Trooper Broome affirmed that he was aware that images of Jesús Malverde are often carried by drug traffickers as "good luck charms" for "protection." *Id.*

Trooper Broome also noted that Mr. Aruiza-Andrade did not appear to have any luggage in the vehicle. Although he had not been able to learn what Mr. Aruiza-Andrade's travel plans were, Trooper Broome testified that he believed Mr. Aruiza-Andrade had been coming from somewhere in California.[5] Given the late hour and Mr. Aruiza-Andrade's apparent confusion about his location, Trooper Broome believed that Mr. Aruiza-Andrade had traveled some distance. Trooper Broome testified that he found the lack of luggage to be suspicious.

After searching the vehicle, Trooper Broome testified that he suspected Mr. Aruiza-Andrade was involved in drug trafficking. Trooper Broome radioed dispatch to request the assistance of a K-9 officer from the nearby Central Point Police Department. Gov. Ex. 1, at 00:26:41. Trooper Broome then provided *Miranda*[6] warnings to Mr. Aruiza-Andrade. *Id.* at 00:29:48. Trooper Broome did not have a copy of the warnings in Spanish and so provided the warnings in English.

While waiting for the K-9 officer to arrive, the troopers discussed how to proceed with their investigation. Trooper Broome decided to call another officer, Trooper Gregor Smyth, to transport Mr. Aruiza-Andrade to the station to perform a breathalyzer test while Trooper Broome continued with his roadside drug investigation. Gov. Ex. 1, at 00:31:45-33:00.

At approximately 11:21 p.m., Central Point Police Officer Brian Munoz arrived with his drug detection dog. Gov. Ex. 1, at 00:40:30. At the hearing, Officer Munoz testified that he and

---

[5] The Court notes that Mr. Aruiza-Andrade was stopped less than thirty miles from the Oregon-California state line.
[6] *Miranda v. Arizona*, 384 U.S. 436 (1966).

the dog circled the truck and that the dog alerted to the passenger side of the vehicle. *See also* Gov. Ex. 1, at 00:40:48. Officer Munoz testified that he lifted the dog into the vehicle, where the dog alerted to the air vent on the passenger side. *See also* Gov. Ex. 1, at 00:41:38.

After the dog alerted to the passenger side of Mr. Aruiza-Andrade's truck, Trooper Broome sought Mr. Aruiza-Andrade's permission to search the vehicle. Gov. Ex. 1, at 00:44:45. Because of the language barrier, Trooper Broome presented Mr. Aruiza-Andrade with the Oregon State Police Notice and Consent to Search Multi-Lingual Form. Gov. Ex. 2.

The Consent to Search form is written in English and Spanish and informs the recipient that he has the right to refuse to consent to a search and that such a refusal cannot be used against him for any purpose. The form also warns that any evidence of a crime and anything subject to civil forfeiture may be seized. Under a heading marked "Consent (Motor Vehicle)" the form says:

> I voluntarily consent to the search of my motor vehicle and its contents. I voluntarily consent to the seizure and analysis of evidence of any crime and to the seizure of anything subject to civil forfeiture.
>
> No threats or promises have been made by any person to make me give this consent.

Gov. Ex. 2.

Trooper Broome directed Mr. Aruiza-Andrade to the Spanish portion of the form and asked whether Mr. Aruiza-Andrade could read, to which Mr. Aruiza-Andrade responded with an affirmative noise. Gov. Ex. 1, at 00:45:01. Trooper Broome testified that Mr. Aruiza-Andrade studied the form for some time and that he believed Mr. Aruiza-Andrade had read and understood the form.

Mr. Aruiza-Andrade gave a verbal indication that he would sign the form and so Trooper Broome removed his handcuffs and gave him a pen. Gov. Ex. 1, at 00:46:10. There are

signature lines on the Consent to Search form under both the English and Spanish translations. In this case, Mr. Aruiza-Andrade signed the form under the Spanish section, using the name Gaspar Jimenez from the Mexican consular identification card he was carrying at the time of his arrest. Gov. Ex. 2.

After Mr. Aruiza-Andrade signed the Consent to Search form, Trooper Broome, Trooper Smyth, and Officer Munoz returned to search the truck a second time. Gov. Ex. 1, at 00:50:00-01:00:03. Mr. Aruiza-Andrade was left in the back seat of the patrol car with the window down. Gov. Ex. 1, at 00:48:47. Trooper Nugent remained at the patrol car with Mr. Aruiza-Andrade, in case he revoked his consent to the search. Gov. Ex. 1, at 00:46:36. Mr. Aruiza-Andrade did not revoke or limit his consent to the search.

During the second search of the truck, Officer Munoz detached the glove box and discovered a pistol hidden behind it. Trooper Broome decided to discontinue the search at the roadside and apply for a search warrant. Trooper Broome directed the other officers to leave the pistol in place.

Once the search was discontinued, Trooper Smyth transported Mr. Aruiza-Andrade to the detox facility to perform a breathalyzer test. Trooper Smyth testified that he administered the test, which returned a blood alcohol content ("BAC") result of 0.00%. Although this BAC was inconsistent with the earlier HGN results, Trooper Broome testified that the did not pursue the DUII investigation any further. Trooper Smyth was unable to recall that Mr. Aruiza-Andrade exhibited any physical signs of impairment, despite being trained to look for such signs. Mr. Aruiza-Andrade was lodged at the Jackson County Jail by Trooper Smyth.

In reviewing the video, it is clear that Mr. Aruiza-Andrade did not exhibit physical signs commonly associated with intoxication. Although Mr. Aruiza-Andrade is speaking Spanish, his

speech was clear and not slurred or slow. There is no indication of him needing support, swaying on his feet, or stumbling when he walked. Although a language barrier existed between him and the officers, he responded as appropriately as he was able. He had no obvious dexterity issues when it came to using his phone. There is no indication that Mr. Aruiza-Andrade himself smelled of alcohol; rather, the smell of alcohol was associated with the vehicle. The physical signs of intoxication are limited to the observation of bloodshot and watery eyes;[7] some bad, but not remarkable driving; and a questionably obtained and administered HGN test. This, and the presence of alcohol (including the open bottle of beer on the back floorboard), are what the police relied on in determining probable cause to arrest.

Mr. Aruiza-Andrade's vehicle was towed to an OSP facility while Trooper Broome applied for a search warrant. On March 19, 2018, Trooper Broome submitted his search warrant application to the Jackson County Circuit Court, supported by his own affidavit and that of Officer Munoz. Gov. Ex. 3. In the application, Trooper Broome sought to search Mr. Aruiza-Andrade's pickup truck for evidence related to the crimes of Unlawful Possession of a Firearm and Unlawful Possession, Delivery, and Manufacture of a Controlled Substance. Gov. Ex. 3, at 6.

A Jackson County Circuit Court judge signed the search warrant on March 20, 2018, and Trooper Broome testified that he executed the search warrant on the same day at 5:27 p.m. Gov. Ex. 3, at 12-14. Trooper Broome seized the earlier-discovered handgun, but the search did not yield any controlled substances.

Mr. Aruiza-Andrade was federally charged with being an illegal alien in possession of a firearm in violation of 18 U.S.C. § 922(g)(5)(A). This motion followed.

---

[7] No mugshot was presented as an exhibit, either to support or rebut this observation.

**DISCUSSION**

Mr. Aruiza-Andrade seeks to suppress the discovery of the firearm, which he contends was found during an illegal search of Mr. Aruiza-Andrade's vehicle.[8] In support of this motion, Mr. Aruiza-Andrade argues that (1) the police unlawfully extended the duration of the initial traffic stop; (2) police lacked probable cause to arrest Mr. Aruiza-Andrade; (3) that the search of the vehicle was not justified by probable cause; and (4) that Mr. Aruiza-Andrade did not consent to the search of the vehicle's interior compartment.

Like many cases involving an initial traffic stop, the Court must review the evolving set of facts that the troopers encountered in real time and determine if those facts support the continued detention of a motorist. The key question here is whether the evolving facts led to probable cause to arrest Mr. Aruiza-Andrade for DUII. If probable cause did not exist, then the detention of Mr. Aruiza-Andrade was unreasonably prolonged, which would require suppression of the gun found in a search of the vehicle nearly an hour after the initial traffic stop. On the other hand, if probable cause existed to arrest for DUII, law enforcement did not prolong Mr. Aruiza-Andrade's detention by calling for a canine unit and seeking consent to search.

**I.     The Traffic Stop**

A person may be stopped by police for a traffic violation and the "tolerable duration" of such a stop "is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop and attend to related safety concerns." *United States v. Rodriguez*, ___U.S.___, 135 S. Ct. 1609, 1614 (2015) (internal citation omitted). "Authority for the seizure thus ends when tasks tied to the traffic violation are—or reasonably should have been—

---

[8] In his motion, Mr. Aruiza-Andrade also seeks to suppress incriminating statements he made to Trooper Broome while in custody. At oral argument, the Government represented that it does not intend to rely on any incriminating statements in its case against Mr. Aruiza-Andrade. The record does not describe these statements or the circumstances in which they were made, nor do the parties offer any detail in their briefing. The Court therefore reserves ruling on the admissibility of any incriminating statements.

completed." *Id.* Such tasks include "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance," as well as "certain negligibly burdensome precautions" related to officer safety. *Id.* at 1615-16.

An officer may conduct unrelated inquiries during an otherwise lawful stop, but "he may not do so in a way that prolongs the stop absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Rodriguez*, 135 S. Ct. at 1615. Put another way, "an officer may prolong a traffic stop if the prolongation itself is supported by independent reasonable suspicion." *United States v. Evans*, 786 F.3d 779, 788 (9th Cir. 2015). "Reasonable suspicion 'exists when an officer is aware of specific, articulable facts which, when considered with objective and reasonable inferences, form a basis for *particularized* suspicion.'" *Id.* (quoting *United States v. Montero-Camargo*, 208 F.3d 1122, 1129 (9th Cir. 2000) (en banc)) (emphasis in original).

In the present case, Trooper Broome credibly testified that he saw Mr. Aruiza-Andrade cross the Interstate's white fog line and that Mr. Aruiza-Andrade was driving in excess of the posted speed limit. The Court therefore concludes that Trooper Broome validly stopped Mr. Aruiza-Andrade for traffic violations.

In total, approximately fifteen minutes elapsed between the initial stop and Mr. Aruiza-Andrade's arrest. Despite the best efforts of both Mr. Aruiza-Andrade and Trooper Broome, the language barrier proved to be a serious impediment to communication. The Court concludes that Trooper Broome was reasonably diligent in pursuing the "mission" of the stop, but the lack of a common language necessitated a certain amount of delay.

The prolongation of the stop was justified, moreover, by a reasonable suspicion that Mr. Aruiza-Andrade was driving while intoxicated. Trooper Broome credibly testified that he detected the smell of alcohol coming from the vehicle and that Mr. Aruiza-Andrade's eyes were bloodshot and watery. Trooper Broome saw a partially consumed beer in the truck's cabin, as well as two unopened beers in a twelve-pack container. Those observations, and the objective and reasonable inferences flowing from them, gave rise to a reasonable suspicion that Mr. Aruiza-Andrade was driving while intoxicated. The Court therefore concludes that Trooper Broome lawfully prolonged the initial traffic stop in order to perform a DUII investigation.

## II. The Arrest

Under the Fourth Amendment, a warrantless arrest must be supported by probable cause. *See, e.g., Stevens v. Rose*, 298 F.3d 880, 883 (9th Cir. 2002) ("We start with the basic proposition that a full-scale arrest must be supported by probable cause.").

> Probable cause to arrest exists when officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested. Alternatively, [the Ninth Circuit] has defined probable cause as follows: when under the totality of circumstances known to the arresting officers, a prudent person would have concluded that there was a fair probability that the defendant had committed a crime. While conclusive evidence of guilt is of course not necessary under this standard to establish probable cause, mere suspicion, common rumor, or even strong reason to suspect are not enough.

*United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007) (internal quotation marks and citations omitted, alterations normalized).

An evaluation of probable cause is based on the totality of the facts available to the officer at the time of arrest. *United States v. Ortiz-Hernandez*, 427 F.3d 567, 573 (9th Cir. 2005). As a corollary to that rule, police may not ignore facts tending to dissipate probable cause. *Id.* at 574. Even if probable cause exists at an early stage of the investigation, "it may be

dissipated if the investigating officer later learns additional information that decreases the likelihood that the defendant has engaged, or is engaging, in criminal activity." *Id.* If probable cause has dissipated, a person may not be arrested or must be released if an arrest has already taken place. *Id.* Probable cause is an objective standard and so the arresting officer's subjective intention is immaterial in judging whether their actions were reasonable for purposes of the Fourth Amendment. *Lopez*, 482 F.3d at 1072.

In the present case, Mr. Aruiza-Andrade was arrested for DUII and Failure to Carry/Present a Driver's License.

In the case of DUII under Oregon law, the threshold for probable cause is relatively low. *Doyle v. City of Medford*, Civ. No. 1:16-cv-01376-MC, 2017 WL 3784038, at *6 (D. Or. Aug. 31, 2017), *aff'd* 742 F. App'x 342 (9th Cir. 2018). "A person is under the influence of an intoxicating liquor, controlled substance, or inhalant when the person's physical or mental faculties are adversely affected to a noticeable or perceptible degree." *State v. Miller*, 265 Or. App. 442, 445 (2014). In *State v. Gilmour*, 136 Or. App. 294 (1995), the Oregon Court of Appeals held that probable cause to arrest existed when the defendant committed a traffic infraction after leaving a tavern parking lot at 2:00 a.m. and, during the stop that followed, the officer observed bloodshot, watery eyes and smelled the strong odor of alcohol coming from the vehicle. *Id.* at 298-300. The Oregon Court of Appeals held that probable cause existed even though the defendant did not slur his speech or exhibit difficulty producing his driver's license. *Id.* at 300.

In this case, as previously discussed, Trooper Broome had noted the smell of alcohol and a partially consumed beer in the vehicle, as well as a pair of unopened bottles. Trooper Broome credibly testified that, while there was no indication of slurred speech or stumbling gait, Mr.

Aruiza-Andrade's eyes were bloodshot and watery.[9] Although Trooper Broome inadvertently asked "when" rather than "how many" beers, he credibly testified that he believed Mr. Aruiza-Andrade to have admitted to having consumed three beers. Based on the totality of the circumstances, the Court concludes that Trooper Broome had probable cause to believe that Mr. Aruiza-Andrade had been driving under the influence of intoxicants.

At that point, Trooper Broome attempted to conduct field sobriety tests on Mr. Aruiza-Andrade. Despite Trooper Broome's belief that Mr. Aruiza-Andrade consented to the HGN test, it is unclear what Mr. Aruiza-Andrade understood when he said "si" to the broad question of "comprende?" It is just as likely he understood he was being directed to perform tests as opposed to this being a request for consent. The Court finds that Mr. Aruiza-Andrade did not consent to the FST.

The Oregon Supreme Court had held that a warrantless administration of a field sobriety test is "search" within the meaning of the Fourth Amendment and the Oregon constitution. *State v. Nagel*, 320 Or. 24, 34-37 (1994). However, the Oregon Supreme Court concluded that the "evanescent" nature of blood alcohol evidence constituted an exigent circumstance and so a warrantless FST is justified when supported by probable cause. *Id.* By contrast, a divided Washington Supreme Court recently held that FST are seizures but not searches within the meaning of the Fourth Amendment and the Washington constitution. *State v. Mecham*, 186 Wash. 2d 128, 141-150 (2016) ("We therefore hold that field sobriety testing is not a search under the Fourth Amendment for the same reasons that it is not a search under [the Washington constitution]: the test reveals only a series of physical characteristics associated with inebriation. These observations are not substantially different from simple, unaided observation of a

---

[9] "Bloodshot and/or watery and/or glassy eyes" are included in the Oregon Administrative Rules' non-exhaustive list of signs and symptoms of intoxicant impairment. OAR 257-025-0010(16).

defendant."). At the hearing, the Government expressed its disagreement with the notion that FST are "searches" within the meaning of the Fourth Amendment and urged the Court to adopt the Washington Supreme Court's interpretation of the Fourth Amendment. The Court concludes, however, that it is not necessary to resolve that issue here. As discussed, the Court concludes that Trooper Broome had probable cause to believe that Mr. Aruiza-Andrade was driving under the influence prior to performing the FST.

With respect to the FST itself, Trooper Broome testified that he performed the HGN test and observed a lack of smooth pursuit and sustained nystagmus at maximum deviation in both eyes. Trooper Broome testified that he observed six out of six clues for impairment in the course of performing the HGN test. The Court has reviewed the video evidence and finds Trooper Broome's testimony credible. Due to the language barrier, Trooper Broome was unable to conduct the other standard FST, which might conceivably have led to dissipation of probable cause. Trooper Broome was also unable to ask Mr. Aruiza-Andrade about possible alternative explanations for the HGN results, such as a medical condition.[10]

Under the totality of the circumstances, the Court concludes that Trooper Broome had probable cause to arrest Mr. Aruiza-Andrade for DUII. As Mr. Aruiza-Andrade was under arrest, the further delay while a canine was summoned did not unlawfully extend the traffic stop.

### III. Search of the Vehicle

After Mr. Aruiza-Andrade was arrested, the police performed two distinct searches of his vehicle. The first and less intrusive search occurred shortly after Mr. Aruiza-Andrade was placed under arrest. The second, more thorough search occurred after the drug dog alerted to the passenger side of the vehicle and after Mr. Aruiza-Andrade had signed the consent to search

---

[10] A medical cause might, for instance, have explained the inconsistency between the HGN result and Mr. Aruiza-Andrade's BAC result of 0.00%.

form. The Government asserts that the search of Mr. Aruiza-Andrade's vehicle was justified by both the automobile exception to the warrant requirement and by Mr. Aruiza-Andrade's consent to the search.

### A. Automobile Exception

"[U]nder the automobile exception, a police officer may conduct a warrantless search of a vehicle if there is probable cause to believe the vehicle contains evidence of a crime." *United States v. Johnson*, 913 F.3d 793, 801 (9th Cir. 2019). "Probable cause exists if there is a fair probability that contraband or evidence of a crime will be found in a particular place under the totality of the circumstances." *United States v. Faagai*, 869 F.3d 1145, 1150 (9th Cir. 2017) (internal quotation marks and citation omitted). "A finding of probable cause must be supported by the objective facts known to the officer at the time of the search." *Id.*

In this case, the initial search was supported by probable cause to believe the search would yield additional evidence of DUII, such as empty bottles or partially consumed beers. During that initial search, Trooper Broome observed that the truck's dashboard appeared to have been disassembled and reassembled at some point. Trooper Broome also noted the presence of a socket wrench set. Trooper Broome knew that drug traffickers often conceal contraband in hidden compartments, including compartments behind the dashboard. Trooper Broome noted the lack of luggage, despite the late hour and indications that Mr. Aruiza-Andrade had traveled some distance. Trooper Broome also noted the presence of an image of Jesús Malverde and he knew that such images were often carried by drug traffickers as good luck charms.[11]

---

[11] In a factually similar case, the Tenth Circuit accepted the presence of Jesús Malverde images as part of the reasonable suspicion analysis. *United States v. Lopez-Gutierrez*, 334 F. App'x 880, 883 (10th Cir. 2009); *but see State v. De La Rosa*, 228 Or. App. 666, 674 n.2 (2009) (Oregon Court of Appeals declining to consider the presence of a Jesús Malverde image as part of the reasonable suspicion inquiry).

Based on these observations, Trooper Broome came to suspect that Mr. Aruiza-Andrade was involved in drug trafficking and radioed to request the assistance of a drug dog. When the dog arrived, it alerted to the passenger side of the vehicle and, when placed in the truck's cabin, alerted to the air vents on the passenger side. "[E]vidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert." *Florida v. Harris*, 568 U.S. 237, 246 (2013). "If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search." *Id.* at 246-47.

In this case, Officer Munoz testified that the dog in question had been certified by the relevant organizations for both Oregon and California and described the standards for those certifications. Officer Munoz testified about the dog's continuing drug detection training, as well as the dog's performance in the field. Based on that testimony, the Court concludes that the Government has offered sufficient evidence of the dog's reliability to support consideration of the alert in assessing probable cause.

Based on the totality of the circumstances, considering both Trooper Broome's observations during the initial search of the truck's cabin and the subsequent drug dog alert, the Court concludes that there was probable cause for the officers to believe that evidence of drug trafficking would be found in Mr. Aruiza-Andrade's vehicle. The warrantless search of the truck was therefore permissible under the automobile exception.

### B. Consent to Search

Before undertaking the second, more rigorous search of the truck, Trooper Broome presented Mr. Aruiza-Andrade with the OSP's multi-lingual consent form. Mr. Aruiza-Andrade signed the form under the Spanish language section, indicating that he consented to the search of

the vehicle. The Government contends that this consent further justified the subsequent warrantless search.

The Government has the burden of proving consent was freely and voluntarily given. *See Florida v. Royer*, 460 U.S. 491, 497 (1983). The Government's burden "is not satisfied by a mere submission to a claim of lawful authority." *Id.* Courts look to the totality of the circumstances to determine whether consent was "freely and intelligently given." *United States v. Basher*, 629 F.3d 1161, 1168 (9th Cir. 2011) (internal quotation marks and citation omitted).

The Ninth Circuit has instructed courts to consider five factors in this determination: (1) whether the defendant was in custody; (2) whether the arresting officer had his gun drawn; (3) whether the defendant was given his *Miranda* warnings; (4) whether officers notified the defendant he had a right not to consent; and (5) whether the defendant was told officers could obtain a search warrant. *See United States v. Jones*, 286 F.3d 1146, 1152 (9th Cir. 2002). No single factor is controlling. *United States v. Kaplan*, 895 F.2d 618, 622 (9th Cir. 1990).

In this case, Mr. Aruiza-Andrade was sitting handcuffed in the back seat of the patrol car and unquestionably "in custody" when he was presented with the consent form. None of the officers drew their weapons during the encounter, nor did any of the officers discuss the possibility of a search warrant with Mr. Aruiza-Andrade. Although Trooper Broome provided Mr. Aruiza-Andrade with his *Miranda* warnings, he did so in English, a language which Mr. Aruiza-Andrade clearly neither spoke nor understood.

The OSP consent form explains, in Spanish, that Mr. Aruiza-Andrade had the right to refuse to consent to the search and that such a refusal could not be used against him. In the dashcam video, Mr. Aruiza-Andrade studies the form for several moments, which Trooper Broome reasonably understood to mean that he was reading it. Mr. Aruiza-Andrade then

signaled his agreement and, when released from the handcuffs, signed the form under the Spanish language section. The Court notes, however, that Mr. Aruiza-Andrade had seen the police search his vehicle before they presented him with the form. He might reasonably have believed he was being asked to ratify the prior search after the fact. Given the language barrier, Mr. Aruiza-Andrade could not have asked any clarifying questions, nor could he have understood the officers' answers.

Under the totality of the circumstances, the Court cannot conclude that Mr. Aruiza-Andrade's signature on the OSP consent form represents free or intelligent consent to the search of his vehicle. However, as the search of the vehicle was justified by probable cause under the automobile exception to the warrant requirement, the Court declines to suppress the search of Mr. Aruiza-Andrade's truck or the discovery of the pistol hidden behind the glove box.

## CONCLUSION

For the reasons set forth above, Defendant's Motion to Suppress, ECF No. 21, is DENIED.

It is so ORDERED and DATED this <u>29th</u> of March, 2019.

                                          s/Michael J. McShane_____
                                          Michael J. McShane
                                          United States District Judge